Good morning. If it pleases the Court, I'm Fiklasburg. I represent Mateusz Fijalkowski. Mateusz came here to the States to be a pool attendant. He couldn't swim. The lifeguard who was on site knew that, and the lifeguard told that to the police. At the pool, he had a psychotic break. The lifeguard called the police. The pool was emptied of everyone other than Mateusz, about nine police officers, and the lifeguard. The pool was locked up so that when the EMTs came later, they had to take a ladder to go over the fence to access him. Mateusz walked into eight feet of water. He couldn't swim, so he walked. He ended up about several feet from three sides of the pool. All this is on a video, which I trust you've seen, so I don't have to describe it in great detail. The lifeguard and at least one police officer were trained in Red Cross rescue, and were aware that after 30 seconds, you go in. If you're the parent of a child, perhaps you go in before 30 seconds, but 30 seconds, you go in. I'm sorry, is that in the record? Has somebody's deposition been taken about that? There was no discovery, Judge, which is one of the problems, but it is in the record. What they knew and what they didn't know? Because it is in the complaint, and the judge recited it in the facts, and specifically said that they were well-pleaded facts. Okay. The lifeguard said he had to go in, and he was told by the police, no, don't go in. He did not go in. How do we know when that happened? We don't know exactly when that happened, because there's no time that's clear, except you can put it together on the video as best you can, and he is there, and I can't tell you better than that, Judge. Do you know how many minutes have elapsed because of the video? There's no audio, Judge. No, but you have to be watching the video. Well, I think the question is, when did he ask to go in? Right, because the argument is that this somehow enhanced the danger, and if we don't know exactly when he volunteered to go in, how do we know that that's, in fact, the case? Because he's standing by the side of the pool looking for about two minutes, Judge. That much you can see. But the district court raised this concern just on the timing, and I don't want to sound disrespectful or anything, that by the time the lifeguard asked, it might already have been too late, and we don't know that that's not the case based on the complaint. We don't, and that's one of the problems with deciding this case on a motion to dismiss. There was no discovery. We could presumably get into the question of what were the lifeguards saying. It's beyond the scope of this record for me to tell you what I know from the lifeguard, but on a motion to dismiss, the facts are to be construed favorably to the plaintiff, and we have alleged that the lifeguard told the police that he had to go in, and he was told no, and thereafter, Mateusz expressed his last breath, and the bubbles came up, and the person taking the video said, whoops, there go the bubbles, and they're still not doing anything. Then he vomited underwater. He still did not go in, and then he went in. So this was a motion to dismiss. I'll get to that procedural point after I recite a little bit more of the facts, if I may. The lifeguard was there, a young man. There were nine, about nine, armed police officers telling him not to go in. He did not go in. He asked again after more than two and a half minutes, at which time, according to the complaint, and I say that because I have better information, but according to the better information favorable to Mateusz, but after more than two and a half minutes, he is allowed to go in, and he retrieves a body. Mateusz has neither pulse nor heartbeat. The EMTs come after the police give him CPR. They do it sufficiently violently to break his ribs. There's no problem with that. They were concerned about the fact that he had died on their watch. They do not resuscitate him. It's in the records. It's in the complaint. The EMTs came, no pulse, no breath, but they had a defibrillator that they brought in over the fence, and they were able to revive him. He went back to Poland. The issues before the court are whether there was a plausible constitutional claim alleged in the complaint for purposes of a motion to dismiss, not a motion for summary judgment, and certainly not a trial, and secondly, whether the defendants were or were not entitled to qualified immunity. There's another issue of state law regarding gross negligence, which I'll get to if time suffices. With regard to the constitutional claim, at issue here is state-enhanced danger, not state-created danger. The defendants acknowledge in their own brief, if you look at page 25 of their brief, that if the defendant officer created the danger or did anything to make it worse, that is sufficient for a constitutional offense. Well, I don't think that's quite right. I think what they're conceding or what we're talking about is whether that's enough for our state-created danger doctrine, which sort of gets you out of Descheny and into at least a possible constitutional violation, but you still have to show that you meet the substantive due process standard, which is, it's not just that they did something to enhance the danger, but that the thing they did was so arbitrary and egregious that it shocks the conscience. I accept that, Judge. I accept that, to which the response is, this was a motion to dismiss, the allegations of the complaint are what they are and the inferences to be drawn are to be drawn favorably to Mateusz so that he might have an opportunity to demonstrate what happened. For example... But the complaint doesn't allege, for instance, that there was any intent to harm on the part of the police, does it? No. There doesn't have to... Well, we have some cases suggesting that maybe in most circumstances you do need that for a substantive due process violation. In some cases, the speeding chase cases, where the police are engaged in conduct, which is, if you will, inherently dangerous, there's a chase case. In a situation like that, there is a need to show intent to harm, and if harm results from the fact that a misfortune occurred as a result of a speeding police chasing a fleeing suspect, there will not be liability absent and intent to harm. This is not such a case. And let me point out, if I may, that the two cases are only... Both sides have only found two cases involving police or, in one case, sheriffs directing third-party rescuers not to rescue a drowning person, Sixth Circuit and Seventh Circuit. In both cases, it was found to be a constitutional violation. The Seventh Circuit in Ross v. U.S. called it, quote, a stunning abuse of government power, and the Sixth Circuit, although there was a different resolution on the qualified immunity issue, agreed. Can I ask you, so about those two cases, and I say this not to be critical of your client because I understand he was experiencing a psychotic episode beyond his control, but there was evidence, well, not evidence, but the complaint alleges that police officers understood or believed that because of that, he was a danger to himself and to others, is what I think the complaint says, or something like that. So in that sense, this case is different from those other cases where you have these, for lack of a better term, truly innocent victims that are not presented to be a danger to themselves or to others. So why wouldn't it have been reasonable for the officers in that circumstance to not at least initially allow the lifeguard to go in for fear of the possibility that he would endanger himself? Let me offer three answers to that. Number one, instructing him not to go in because otherwise he'd be a danger is at the risk of his dying, which is virtually what happened. So it, the risk here, one of the persons at risk was Mateusz, and he ended up being subpoenaed. Sure, but the officers have to think about not just your client. I accept that, Judge. Secondly, there was a professional lifeguard there. The professional lifeguard was fully knowledgeable of Mateusz's state. He is the one who became upset when Mateusz started walking around. He was talking in Polish, he was blowing his whistle, he was behaving in a bizarre manner. He yanked at the arm of one of the pool patrons to grab her colored bracelet because she wasn't supposed to be in the water. And he wanted to go in. And lifeguards, and again, this is a question of discovery. I never was able to present an affidavit or certainly not evidence from a lifeguard, a water safety expert, who will say what lifeguards are trained to do. People who are drowning create problems. So what does the complaint say about danger to others? The complaint says that he was not, that the police had reason, let me step back. The complaint says that the police had independent grounds to take custody of Mateusz on either of two grounds. He had, in fact, grabbed the arm of one of the patrons to take the colored bracelet. And he was also displaying such a behavior that he could have been taken under the mental health seizure provisions for observation. They took the position that wasn't a problem. They didn't have to do anything because he wasn't sufficiently dangerous to do anything. So they just left him alone. But you see, that allegation helps the police to some extent because if he is a danger to others, and I didn't hear any, I did watch the film, and I didn't hear any conversation around the pool about how dangerous he is to other people. And I had missed, frankly, that portion of your complaint. But if you say that he would be a danger to others, and we take the complaint as true. Let me refine what I said. But the complaint does say that he's a potential risk of harm to himself and others. He certainly was a potential risk of harm to himself. Absolutely. He's a man who cannot swim. He's going into the water, he is entering the water, he's at a pool with eight feet of water. Let's talk about the potential risk to others. The potential risk to others exists only to this extent, I respectfully submit. If you see his posture for the minute and a half at the beginning of the video before he goes in, he's a risk to nobody. He is standing there completely quiet, without any aggression, without any movement. None of the police officers are on guard. They're as casual as can be. That is not a risky situation that he's portraying. He goes into the water, and no big deal. With regard to- When I read the complaint, I get a strong sense that you're in a bit of a bind, because you're trying to make these two different claims. And one is that really the police should have done something. And to advance that claim, you're making all of these allegations, and you just, well, he's pulling at this girl's arm, he's behaving erratically, he's a danger to himself and others. But then you're also trying to make this claim that they really should have let the lifeguard go in. And you're a little bit at cross purposes with yourself in the complaint, because now everything you've said about why the police should have effectuated a mental health seizure turns out to be unhelpful, and why they should have let a lifeguard go in. Let me respond. They could have. They could have done that. I believe that they had the statutory authority to seize him, either as a criminal matter or as a mental health matter. They didn't. And I'm not second-guessing them on that for purposes of this lawsuit. What's at issue here is they didn't think that he was a problem. They let him go. They didn't get, they didn't do anything. They just let him walk into the water. They didn't seize him. They didn't take any steps to control him. They didn't have to, because he was not aggressive for all the period that they were there. The business about the one person was, I put it in as a predicate for what they could have done had they decided to remove him from the premises. It doesn't, I didn't mean to detract from the notion that he himself did not present the problem, and the lifeguard, who is fully chargeable with knowledge of what people who actually called the police wanted to go in. Yes, but you see, my problem is, I all along thought that, okay, if this went further and we have depositions, we're going to have the police officers, perhaps we're going to have the police officers say they were afraid of what he would do, that he was a dangerous person, and therefore they didn't want even a trained lifeguard to go in after him. And now the complaint gives that kind of argument some legs at the 12B6 stage. Judge, I don't think it gives the legs at the 12B6 stage, and if it's a question of a lawyer's failure in pleading, so be it. But what is at issue here is that they let him go in, and they could have, they could have detained him, they could have detained him on a de minimis report that he had grabbed at the bracelet of a patron. I make that point simply in terms of showing that they had the capacity to detain him if they thought it was sufficiently important to do so, and they didn't. They didn't detain him because he had been violent, they didn't detain him because he had assaulted anybody, they didn't detain him for any reason. I understand your argument, I still think there's a problem, but go ahead. Let me go to the issue of qualified immunity. The issue here, I would like to bring to the court's attention a case that I came across only recently, and I did give notice to counsel, that's Gherkin v. State of Michigan, 9-12 Fed 3rd, 907, 6th Circuit, 2019, and it was en banc denial. That was a case involving the Flint, Michigan water crisis. There had never been one before. That was a unique situation that hadn't arisen, and the court had to struggle with the question of how do you address the issue of qualified immunity in a unique situation in which this kind of scenario has not previously occurred, and what the court found and what they held was you have to have discovery. You have to get the information about what happened, and you have to understand the state of mind of the alleged bad actors. We have to know that. The single most important question to ask of the defendants in this case is the following, what were you thinking? What were you thinking as that video played? We don't have the answers to that. Maybe they'll say what you said, Judge, and maybe they'll... It was what you said, and they're lying. Well, all right, I've explained it as best I can, Judge, as a predicate for how they could have asserted themselves to prevent the whole thing from coming, but nevertheless, they didn't touch it with a 10-foot pole because he was no problem, and I will represent to you that in the police reports that were made, they said that. We couldn't seize him. He wasn't causing a problem. We couldn't prevent him from going in because he wasn't... There was nothing we could do. We had no right to put our hands on him, so to speak. So is it your position that the subjective motivation of the officers is really important? This is not an objective standard. We don't ask whether something more like, look, could a reasonable officer have said... If a reasonable officer, some hypothetical reasonable officer, could have thought there was a danger to the lifeguard here, then it doesn't shock the conscience. There's no question, but it has to be an objective test. There's no question about that, but what we have to understand is what they understood and what they were thinking at the time, what information they had, what they were waiting for, what they were thinking of doing, what was happening. Because on the face of it, it's completely bizarre. Somebody walks into eight feet of water, and they walk around and chat and do nothing, and they pull out somebody who is, if you will, for all intents and purposes, dead. He was resuscitated. He had no pulse and no breath. We need to have that information, and the complaint is sufficient, I respectfully submit, on a motion to dismiss to permit that to be obtained. The judge offered, if you will, the judge not only accepted but promulgated the defense in the case. I understand that the defendants are going to make the defense that the judge offered, that they were afraid that he was going to be violent and all the whatever. That's going to be challenged because of the police reports that would come into evidence. I don't think that I attached the police report to the complaint, but they talk about the fact that they didn't do anything. They let him go in because they had no basis to control him because he wasn't doing anything. So we've let you go a fair amount of extra time. I think you have some rebuttals. Yes, ma'am. Thank you. Thank you. Good morning. Good morning. If I may please the court, I'm Kimberly Baltham. I'm here with co-counsel Jamie Greenswag, representing the 11 Fairfax County police officers that were sued in this litigation. This case was properly dismissed, even at the 12B stage, by the district court because the complaint, even assuming the veracity of all of the allegations made therein, was insufficient as a matter of law to set out a state-created danger claim given the current state of the U.S. Supreme Court and this circuit's decisions with regard to state-created danger. What was the plan? What was the police officer's plan? Well, I think if we read the complaint as we're required to, the plan was to wait until some point in time where that rescue could be effected in a way that successfully balanced the fact that we had someone in the water who, given, had gone in twice and come out on his own, but now this is the third time and he's not coming out like he had before. And we're balancing that, the fact that we know that there's a risk of harm to Mr. Fielkowski, with the fact that we've got members of the public, specifically the lifeguard, who are on scene, and the police are balancing those competing interests, which really is what the Fourth Circuit and the U.S. Supreme Court talk about in cases like County of Sacramento versus Lewis, where we've got the high-speed chase. I guess I really don't understand, I understand that explanation as a general matter, but if you, we have the film here, and by the way, how did the film get made? Some bystander? A bystander who was outside of the chain link fence. Okay, so the bystander takes the film and you see the police officers, not alarmed, not even particularly concerned talking about this, they're just sort of walking around chatting, maybe with each other, and then this man is underwater for a significant period of time, the lifeguard wants to go in, no, and it's sort of like, well, they wait till the bubbles show, I just, I didn't see that as part of the plan that you were talking about. That seems to me to be a step further, I mean, were they really waiting for him to die, and then they were going to take him out? Was that the plan? No, certainly not. I think they're waiting for those risks to the lifeguard to be mitigated sufficiently, such that they could affect that rescue in a way that took account for, not just Mr. Fielkowitz. How do we know that on the face of the complaint? I don't think that you do. I think we have to take the complaint to allege that the lifeguard asked for permission to go in, I think if you read the complaint as it flows chronologically, at about a minute and 30 seconds, I think is where the allegation comes, that the lifeguard tells the officers that he thinks that he needs to go in, the officers at that point tell him, no, it's not, that's not going to happen, you're not going to go in at this point, and that there's some brief period of time that I think is about one minute, if you look at the video after that, certainly counsel alleges that after a minute and 30 seconds, any reasonable police officer would know that he was at risk of drowning at that point, and so then the second time the lifeguard communicates to the officers that he thinks that he needs to go in, at that point the officers instruct him that it's okay for him to enter the water, they enter the water as well, and Mr. Fielkowski is pulled out so that CPR efforts can begin. And I think we do need to take that as alleged in the complaint to be accurate at this point. We don't need discovery for multiple other reasons, to include that the standard here in the Fourth Circuit for this kind of case is an intent to harm, and there's nothing in the complaint that would give rise to the conclusion, even at this stage of litigation, that waiting and instructing the lifeguard not to get in the water for that one minute or so period of time evidences an intent to harm that is conscious, shocking behavior, which is sufficient for a substantive due process violation. Well, actually, I think that the tape lends perhaps a credence to, well, I mean, let's take another scenario. We will teach this guy a lesson. You know, we're not, we're not going to send any, and they didn't have to wait for the lifeguard to volunteer himself. They could have said, look, come get this fellow. Does anybody know whether he's dangerous? It doesn't seem to, that's why I asked you what the plan was. It was to like, to wait to the last possible moment, and maybe they waited a moment too long, or a minute too long. And that's what, I think that that lends itself on the complaint and the film, it's part of the complaint, to a claim, maybe a trial case. There's no evidence, and there's no allegation. There's no evidence that they cared about him at all. There's no allegation in the complaint that the officers had any intent to teach him a lesson for getting in the water the third time. There's no evidence that they didn't. They're walking around just like, you know, like this gentleman's walking around the courtroom. They just are free and easy. That's true. And the allegations in the complaint, which we have to take, even though they are, I think, Justice Harris, you're correct that it cuts both ways for the plaintiff in this case. He's trying to allege that they should have taken him into custody because he is so erratic and so irrational and a danger not just to himself, but also to others at the pool. And that's in the complaint at paragraph 19, which is in the joint appendix at page 12. That cuts against the plaintiff, but we assume it to be true at this stage of the that he was a danger to himself and others. He's suffering from an episodic, I'm sorry, an episode of psychosis. He's mentally unstable. And that the officers specifically were aware that that was the situation that they were presented with. These officers had a CIT, a crisis intervention trained officer, come to the pool deck specifically to try to address that issue. That is alleged in the complaint. What did that person do? I'm sorry. He attempted to, the complaint alleges that that officer attempted to speak with Mr. Fielkowski, but that that was not, he wasn't able to communicate with him because Mr. Fielkowski refused to substantively communicate with the officers. It wasn't because... He was underwater? No, no, no, ma'am. It was when all the officers were on the pool deck. Well, they were all on the pool deck the whole time in the film. That's correct. So he is underwater. The officers were on the pool deck for a significant period of time, according to the complaint, dealing with Mr. Fielkowski, trying to communicate with Mr. Fielkowski. They called a Polish speaking officer to come to the pool deck. They got a crisis intervention trained officer to come to the pool deck. All of that happens prior to the beginning of the video. Also prior to the beginning of the video, according to the complaint, Mr. Fielkowski puts himself in the water, submerges himself in the deep end of the water two different times and successfully brings himself out of the water. And so those are... The district court did not conclude that there was no constitutional violation, did it? The district court relied on qualified immunity. Which you haven't talked about. I haven't, and I'm happy to turn to that. With regard to qualified immunity in this case, I do think that it is dispositive, even if the court chooses not to address the substantive constitutional issue. The bottom line here in the Fourth Circuit, and based on U.S. Supreme Court case law, is that no court that would be controlling on these law enforcement officers establishes, with regard to due process law, the right of a suicidal individual to a police rescue or a police-allowed rescue at a particular point in time. In fact, no circuit has found a constitutional violation with regard to law enforcement officers addressing an adult suicidal individual. We cited to three circuits, the Third, the Sixth, and the Tenth, which to my knowledge are the only circuits that have addressed a due process violation with regard to law enforcement officers. So I'm sure you're familiar with the fact that the whole qualified immunity doctrine is getting some attention by the Supreme Court now. Certainly. And does what you were just saying suggest to us that maybe the Supreme Court should rethink the qualified immunity doctrine. The modern qualified immunity doctrine, of course, is not good faith and is far away from what qualified immunity once was. Certainly, and certainly the U.S. Supreme Court might at some point do that, but unfortunately for this case and this posture, for events that happened when these events occurred, the U.S. Supreme Court is routinely overturning circuits such as the Ninth Circuit in law enforcement officer cases with qualified immunity under the argument that the circuits are not properly applying qualified immunity. And I understand that there's a kind of a joint part to this. We look to U.S. Supreme Court precedent, we look to Fourth Circuit precedent when we determine what the clearly established law is, but that we also have to look at is this behavior so egregious that any reasonable law enforcement officer would know that you're not supposed to do that. And so my argument as to that are that in every circuit that's considered a law enforcement officer's obligations with regard to addressing specifically a suicidal adult, which is what we had here, someone who is intent on harming himself and intent on staying at the bottom of that pool, no court has found that that behavior by the law enforcement officer in on-scene would ever give rise to the notion that any reasonable officer would know that making those on-scene decisions during that suicidal effort shocked the conscience such that it is a due process violation, even though no court has told us that it is a constitutional violation. The only... Can I ask you just a quick question about the call? You are not arguing that there wasn't an affirmative act here sufficient to sort of get us into this due process inquiry, right? I think that the court's recent decision in Turner v. Thomas gives a really good basis for the argument that this was not an affirmative act. This court, in the Turner v. Thomas case, specifically held that a stand-down order by law enforcement to other law enforcement officers... But that's different because it's just, it's all the government. That's the government telling the government to stand down. This is, so it's really just one actor, but this is the government telling a private party. I thought we held in Turner, that's just a manifestation of the government deciding not to act. Yeah. So it's a negative omission case. But this one, it's not just the police officers not getting into the pool themselves, and I have a whole bunch of questions about why that didn't happen, even if they were worried about the lifeguard. But this is the police telling the lifeguard, you can't go in either. Why isn't that an affirmative act? I would still argue that under the parameters of Turner, even though it was a law enforcement officer telling another law enforcement officer not to act, you have to look at this in the context of these law enforcement officers who are on scene and attempting to effectuate a rescue of this person in the context of the factors that they've been given. It's better for us, given your opinion on Turner, because we recognize in case law that these officers don't just have an obligation to act in a particular way themselves with regard to effectuating this rescue. They have an obligation to that lifeguard. I would argue to you that if the lifeguard had communicated to the officers the desire to go in the water to effect this rescue, and the officers had told him to go in, they're setting themselves up on the other side for that argument. I agree that there's the fact that they are trying to protect the lifeguard gives rise possibly to an argument for why this doesn't meet the substantive due process standard because they're balancing the risk. But I guess I was trying to ask you about this sort of threshold question. Are we out of Dushaney? Is this more than just a failure to protect claim because there was an affirmative act? But you are not conceding that there was an affirmative act? I'm not. I'm not. I think this is covered. I think this is covered by Dushaney. I think there is an issue here as to whether the communication that the officers had with the lifeguard was an affirmative act or simply a failure to act for a period of time. But we're on 12b-6, so for purposes of 12b-6, there's enough to say that there's an affirmative act. I would concede that point. Mr. Glassberg alleges that those officers engaged in an affirmative communication to that lifeguard that prevented him from entering the water. I think that this court's decision on Turner brings that into question to some extent. But I think I have to concede that at this point because it's the 12b. Counsel made reference to the Seventh Circuit case with regard to the law enforcement officers who prevented a private rescue in a body of water. And that is the only case, again, to our knowledge in the country that addressed either a suicidal adult or a water rescue, both of which are issues that are involved with this case, where the court has said, and it's outside the Seventh or the Fourth Circuit, but where the court has said that there could be a due process issue that accompanies that. And so I want to address that. The difference between the Ross facts and the facts that we have here in the due process context is that the reason that the Seventh Circuit found that that due process argument could potentially be viable is because the reason that the officer engaged in the action that he engaged in was because of a city policy that prohibited that rescue. And so if you look at it from the global due process context, the purpose of the due process clause is to prevent arbitrary enforcement of a government action. And so the officer in that case was acting arbitrarily. He was saying to the people who were on scene, not, I'm taking into consideration that these people are in the water, that they've been in the water for X amount of time, that our rescue is coming in X number of minutes. He simply was saying, no, there's a policy that says you can't do this. I'm enforcing that policy. I will arrest you if you get in the water. And he physically took his boat and he blocked the private rescue. That's not what we have here. And the complaint gives rise to the reasonable conclusion, even taking everything in light of what is most favorable to Mr. Fielkowski, that those officers were not engaged in an arbitrary exercise of their power. They were mitigating the risk to Mr. Fielkowski while taking into account what the complaint admits, that Mr. Fielkowski was a danger to himself or others. And so they're in a situation where they are trying to manage this lifeguard who has communicated that he thinks he needs to go into the water, and they have an obligation to that individual as well. It doesn't go beyond the four corners of the complaint to say that. Courts routinely recognize that. So is this like a sliding scale? How long could the officers legitimately wait before making that call? I don't think so, because we're at 12B at this point. And so I think we have to assume, Mr. Glassberg alleges that they waited too long. I think that's all we need to know from the plaintiff's perspective. Obviously, if this case goes on into discovery, it will be relevant how long went by before the lifeguard asked. We don't know. It seems like Mr. Glassberg is acknowledging to the court that we may never know that. You can't tell on the video, and he doesn't know. And that's a hard thing to pin down. But if this case proceeds further in discovery, that's going to be Mr. Glassberg's obligation. And he seems to be saying to the court that he's not going to be able to meet that at this point, because we just can't tell from the video when that happened. To follow up on that question, the thing that I think speaks out to you that distinguishes this case from the other cases is that this plaintiff didn't die. I'm sorry? The plaintiff did not die. Well, obviously, that's an important factor from our perspective, because the rescue was successful, ultimately. And so... So is that determinative? If the plaintiff had died, we would go the other way? No, I don't think so. Well... I don't think so. Why is it an important factor? It's an important factor because the rescue was successful. Part of the argument here is that these officers waited until he died to pull his dead body out of the water. And that's just a mischaracterization, given the fact that whatever happened underwater, when the officers saw the bubbles, and then the lifeguard communicated to the officers that he needed to go in, and the officers went in to help the lifeguard pull him out, that they were able to resuscitate him. We don't know at what point during this video, or during the third entry into the water, when would it have been too late? When is it still okay? But what I'm asking you is, if it had been too late, it seems to me that your position is a lot more difficult, because they've been standing around, walking around the pool doing nothing for a significant period of time. The complaint, I would... We're on our stage right now, with the complaint and this video. And the complaint acknowledges that during the time that the officers were on the pool deck during the third entry into the water, that they were monitoring Mr. Fielkowski. We can see what they're monitoring. Certainly. And how they're monitoring. Certainly. And we also know that we have a lifeguard there that wants to go in, and they tell him not to go in. That's correct. For a period of time. And I don't think we would couch that as, they tell the lifeguard don't get in the water, and then it's the end of the sentence. I think what we couch that as, is that those officers engaged, at best for Mr. Fielkowski, in a one minute or so delay of the lifeguard's entry into the pool, because they are... You and I have had this discussion a few minutes ago. They could have, they knew the lifeguard was there, they could have... Five minutes after he'd been in the water, they could have said, go, go get him. Certainly. Two minutes. Certainly. Certainly. And at some point during that continuum of time, I think we would get into arbitrary action. We're not going to save this person or make any attempts to save this person. But that's not what happened here, and that's not what the complaint alleges. At most, the complaint alleges that those officers told the lifeguard to get in the water seconds after Mr. Fielkowski would have liked for them to. And the courts are very clear, both the US Supreme Court and this court, is clear that when you're addressing situations where you're mitigating risks to multiple people, not just a suicidal individual, but also people on scene, that a disagreement about how to handle that does not give rise to a due process violation. Well, let's talk about the people on scene. Everybody is locked out of the pool except for the lifeguard and the police officers and the victim. That is correct. I reference only the lifeguard when I talk about people on scene. And I take the complaint to say that Mr. Fielkowski being a danger to himself or others is in reference to the fact that there is a citizen lifeguard who's standing on the side of the pool and that the officers need to take his safety into account when making decisions about how to manage the risk of Mr. Fielkowski. So, with respect to the issue of qualified immunity, our case is pretty clear that you don't always necessarily get a case directly on point to show an officer should have acted in a manner consistent with what the law requires. So, I guess the question presented here is, is this such a case and if not, what if they had waited 30 minutes and then let the lifeguard go in? Do we need a case directly on point to say that the officer would have violated this particular place? No, I would concede that if we have a case where the officers stand on the side of the pool for 30 minutes after Mr. Fielkowski goes underwater for the third time, before they try to effectuate any recovery of his body, that that might be a situation where reasonable people would say those officers should have known that you don't wait 30 minutes. Okay, so in this context, why isn't it for a jury to decide that question given the allegation and the complaint that 30 seconds was the, sort of, the minimal time that was appropriate to keep someone underwater? The allegation in the complaint was that any reasonable person would have known after 30 seconds that Mr. Fielkowski was at risk of drowning. The allegation was that the officers knew, at least one officer knew. That he was at risk of drowning, that's correct, that's correct. After a minute and 30 seconds, the allegation is that any reasonable officer would have known that he was attempting to... Why do we need a case directly on point to show that the officers were, that they're not entitled to qualified immunity? Because the cases that have heard this issue, the Lewis case, cases in the other circuits,  either a high-speed chase situation like we had in Lewis, or the three circuit cases where we're talking about officers who are responding to a suicidal individual and trying to manage that situation, to try to end that situation without anyone getting hurt, that those officers have competing obligations, not just to the person who is suicidal, but to others. In this case, that would be the lifeguard. And so, this is a little bit different of a situation where you have officers who have to mitigate that risk to multiple people. And that's why the case law, even on qualified immunity, allows for that. And no reasonable officer would have known that at 30 seconds, I have to tell that lifeguard to jump in the water, in eight feet of water, with someone who is intent on staying under, and intent on killing himself, who is in the middle of this psychotic break. I would suggest to you that no reasonable officer would have told the lifeguard at that moment in time, until it happened, to get in the water. And if they do, they're facing the same argument from the lifeguard, if the lifeguard ends up getting injured. And that's the problem that we have with these officers, trying to mitigate that risk to the lifeguard. That's why they're entitled to qualified immunity, not just because no court has said it, in the context of a case that is similar, but because no reasonable officer, responding to a suicidal individual, would tell a citizen to get into eight feet of water with that person, which is a danger to that citizen. That's terrific breath control, I will tell you, you must be a singer, but my colleague has a question. I just want to make sure I, because I totally understand the gist of what you're saying, but, so are you saying, would it be different if the complainant had alleged that at a minute and 30 seconds, it's not that you would know of a risk of drowning, but that you would know this person will die in a minute and 30 seconds? Certainly. Okay. It's reasonable to me that... So you're emphasizing the risk, and the balancing of the risks. According to the complaint, yes. Okay. And I just have one other question. And so I totally understand what you're saying about protecting the lifeguard, but why didn't the police officers just go into the water? Like, you could send two of them in, wouldn't that be perfectly safe? They're minimizing risk to themselves, and then you get into a Turner situation. Those officers have obligations, not just to Mr. Fielkowski and the citizen. There's so many of them. They didn't feel that a bunch of them could go into the water and safely take him out, or at least we expect that's what they would say. That is correct. We don't know that, because we're dealing with the complaint, but they are mitigating risk. Are they appealing, as I understand the posture here, whatever the police officers themselves should or should not have done, apart from the order to the lifeguard, is no longer on appeal, right? No longer on appeal is the argument that there was a fourth amendment violation. Or that... Are they appealing, I can ask them, that the police officers, the failure to act itself violated the substantive due process? I mean, I think they've given that up at this point, because the case law is so obvious on that point. Okay. Thank you. Thank you. A few points in rebuttal, please. Judge, I believe you asked the question, what was the plan? And that's exactly what we don't know and what we have to know. The police rescue effort was, in fact, unsuccessful. They waited too long. Luckily, the EMTs got there and got over the fence. The lifeguard was a professional. The lifeguard was a professional working at a community pool. It's alleged that he's properly trained. It's alleged that he was ready, willing, and able to effectuate the rescue. I never got a chance to present whether my law enforcement expert as to the obligations of the police or my water safety expert, even having to present a declaration to the court as to what happens in the course of a rescue, how lifeguards are trained, what they're trained to deal with, with people who are drowning. And that's without regard to the myriad equipment that was all over the place, whether it's a shepherd's crook or the tubes or the raft that I think you see at one point in the video. Counsel suggests that Ross is a better case. I suggest just the opposite. In Ross, the police officer had at least this justification. He's an officer and he's operating under an instruction. He's in a paramilitary organization and he's told that this is how he's got to do it. Here, there was no constraint on the lifeguard. He was in fact contractually obliged to jump in. He was professionally obliged to jump in. I would say he was morally obliged to jump in. And he was stopped by a capricious order of a police officer or officers with no justification similar to that in Ross, where at least there was some policy. If you see somebody drowning, don't have the lifeguard until something happens. That's absent here. So I believe we're a fortiori to Ross rather than the other way around. With regard to the danger that Mateusz posed, I would ask you to look at paragraph 27 of the complaint, which focuses on the police and the danger that Mateusz posed. Despite recognizing Mateusz's inability to safeguard himself from possible harm as he once again moved to enter the pool, the defendant officers did nothing. Specifically, they did not singly or in a group tell or gesture Mateusz not to enter the pool a third time or place themselves between him and the pool so as to prevent his attempt in entering the water over police direction that he not do so. To the extent the complaint talks about a danger here, it's a danger to Mateusz. He's the one whose danger and whose problem and whose risk was minimized by the police. It doesn't talk about danger to others anywhere in the complaint? Only in the sense in which I explained before, Judge, that had the police seen fit to do so, they could have expanded upon the fact that somebody reported to them that he had grabbed at the colored bracelet of one of the patrons to prevent her from going into the pool. In principle, use that as an excuse to seize him, if you will. Also, on the mental health basis, that they could have independently seized him for his own benefit for a mental health examination and security. That's the limited purpose from that. I understand from the questioning I've received from the court that created a problem for me, but that was the thrust of- But the district court really emphasized it too, right? Yes, Judge, but the district court, I respectfully submit did not adjudicate this motion to dismiss in accordance with the standards properly appropriate to motions to dismiss, which is to construe facts favorably to the plaintiff and not to make out a defense case. That's what the court did. Let me bring to the court's attention one of the two cases that I brought as subsequent authority. It's a Graves v. Robinson case. And in that case, on the motion to dismiss- I think you can be sure that we know the case. You do indeed. But what's interesting is on the motion to dismiss, the motion was denied. And then they went on summary judgment because they had discovery. And at least the plaintiff had the right, the capacity to present the case as to why the plaintiff should prevail. And they were allowed to go forward. That's what we were not allowed to do. And I submit to you that that's what should happen. Let me offer another citation from a case which I know you know well, because Judge Harris wrote the opinion. It's Harris v. Pittman, a decision in June of this year. According to Harris, when viewed in the proper standard, construed in the light most favorable to him, with all reasonable inferences drawn in his favor, the record evidence would allow a reasonable jury to find that Pittman violated his clearly established constitutional rights. We agree. That involved the case where somebody repeatedly shot someone. And the case was permitted to go forward, that a jury might decide that what happened was excessive. That's all we're looking for at this point. Nobody's asking for an adjudication of the merits on this point. That's all I have, unless there are questions from the court. Thank you very much. Thank you. What we would like to do is go down and thank the lawyers for their argument. And then we will come back to the bench, and we'll take any questions that any of you all have. But of course, not about these cases. And if you don't have questions and you want to leave, that's fine, too. So maybe I'll ask the clerk to adjourn court. And then we'll come down and see a lot of lawyers. And then we'll come back. Thank you. This is also a court. Sam's the juror. I'm the signing guy. God save the United States. This is also a court.
judges: Diana Gribbon Motz, Albert Diaz, Pamela A. Harris